Plan assets are managed with a long-term perspective to ensure that there is an adequate level of assets to support benefit payments to participants over the life of the pension plan. Plan assets are managed by external investment managers. Investment management performance is benchmarked for each asset base. An independent consultant assists the Company with investment manager selections and performance evaluations. Plan assets are broadly diversified to minimize the risk of significant losses. The other category includes U.S. cash equivalents that are held to meet the liquidity needs of the Plan.

The Company's funding policy is to contribute, annually, an amount between the minimum required and the maximum deductible for U.S. federal income tax purposes. Benefit payments and contributions under the pension plans included $109.5 million and $66.8 million paid from employer assets in 2004 and 2003, respectively. Employer contributions and benefits paid under the postretirement plan included $2.1 million and $1.5 million paid from employer assets in 2004 and 2003, respectively.

Information about expected cash flows for the pension and postretirement benefit plans is as follows:

|  | Pension Benefits | Postretirement Benefits |
|---|---|---|
| Expected Employer Contributions 2005 | $ 61,031 | $ 2,837 |
| Expected Benefit Payments |  |  |
| 2005 | $ 19,261 | $ 2,837 |
| 2006 | $ 21,131 | $ 3,194 |
| 2007 | $ 22,438 | $ 3,537 |
| 2008 | $ 28,758 | $ 3,988 |
| 2009 | $ 38,930 | $ 4,600 |
| 2010-2014 | $299,043 | $35,245 |

For the postretirement plan, the assumed annual rate of future increases in per capita cost of health benefits was 11% in 2004; the rate is assumed to decrease gradually to 6.0% by 2007 and remain at that level thereafter. These trend rates reflect management's and actuarial's expectations of future rates. The health care cost trend rate assumption has a significant effect on the amounts reported. Increasing the health care cost trend by one percent would increase the postretirement accumulated plan benefit obligation by $1.5 million and the service and interest cost by $0.3 million. Decreasing the health care cost trend by one percent would decrease the post retirement accumulated plan benefit obligation by $1.4 million and the service and interest cost by $0.3 million.

*United Kingdom Plans*

The Company has various qualified and nonqualified defined benefit plans, which provide retirement and death benefits for the Company's employees residing in the United Kingdom, including employees of the CEMEA region as well as Visa Europe. Calculation of pension plan expense is similar to the United States plan. Regular plan benefits are determined based on years of service, age and the employee's highest average of eligible salary for any three consecutive years during the last ten years of employment. Pension plan assets are invested in pooled funds. The last actuarial valuation for this pension plan was made on September 30, 2003. The projected benefit obligation was based on September 30, 2004 assumptions.

The existing pension plan, based on a defined benefit scheme, was closed to new employees in June 2003. Employees hired after June 2003 began participating in a new scheme based on a defined contribution plan starting in October 2003.

**Visa International and Subsidiaries**
## Notes to Consolidated Financial Statements
*(Dollars in thousands, except as noted)*

The following tables provide an aggregate reconciliation of the benefit obligations, plan assets, funded status and amounts recognized in the accompanying Consolidated Financial Statements related to the qualified and nonqualified retirement plans:

| September 30, | 2004 | 2003 |
|---|---|---|
| *Change in Benefit Obligation:* | | |
| Benefit Obligation – | | |
|   Beginning of Year | **$152,078** | $101,726 |
| Service Cost | **14,933** | 11,701 |
| Interest Cost | **8,804** | 7,203 |
| Actuarial Loss | **8,736** | 23,562 |
| Benefit Payments | **(16,460)** | (554) |
| Foreign Currency | | |
|   Exchange Rate Changes | **12,569** | 8,440 |
| Benefit Obligation – End of Year | **$180,660** | $152,078 |
| Accumulated Pension | | |
|   Benefit Obligation | **$137,956** | $119,579 |
| *Change in Plan Assets:* | | |
| Fair Value of Plan Assets – | | |
|   Beginning of Year | **$ 99,812** | $ 56,737 |
| Actual Return on Plan Assets | **9,388** | 9,124 |
| Employer Contribution | **27,741** | 29,047 |
| Benefit Payments | **(16,460)** | (554) |
| Foreign Currency | | |
|   Exchange Rate Changes | **8,156** | 5,458 |
| Fair Value of Plan Assets – | | |
|   End of Year | **$128,637** | $ 99,812 |

| September 30, | 2004 | 2003 |
|---|---|---|
| *Funded Status:* | | |
| Funded Status – End of Year | **$(52,022)** | $(52,265) |
| Unrecognized | | |
|   Prior Service Cost | **448** | 688 |
| Unrecognized | | |
|   Net Actuarial Loss | **69,028** | 65,841 |
| Unrecognized | | |
|   Net Transition Obligation | **–** | – |
| Net Amount Recognized | **$ 17,454** | $ 14,264 |
| *Amounts Recognized in the Consolidated Balance Sheets:* | | |
| Prepaid Benefit Cost | **$ 7,636*** | $ 35,277 |
| Accrued Benefit Liability | **(7,190)*** | (21,013) |
| Net Amount Recognized – | | |
|   End of Year | **$ 446*** | $ 14,264 |

*\*CEMEA region's portion*

Assumptions used to develop the projected benefit obligation were as follows:

| September 30, | 2004 | 2003 |
|---|---|---|
| Discount Rate – Qualified | **5.3%** | 5.3% |
| Discount Rate – Nonqualified | **5.3%** | 5.3% |
| Rate of Increase in Compensation | | |
|   Levels – Qualified | **4.0%** | 4.0% |
| Rate of Increase in Compensation | | |
|   Levels – Nonqualified | **5.0%** | 5.0% |

Net periodic pension cost included the following components:

| For the Years Ended September 30, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Service Cost | $14,933 | $11,701 | $7,526 |
| Interest Cost | 8,804 | 7,203 | 4,962 |
| Expected Return on Plan Assets | (9,422) | (6,863) | (6,297) |
| Amortization of: | | | |
| Prior Service Cost | 240 | 179 | 197 |
| Actuarial Loss (Gain) | 5,585 | 6,240 | (184) |
| Transition Obligation | – | – | 10 |
| Lump Sum Risk Premiums | 509 | 714 | 398 |
| Net Periodic Pension Cost | $20,649 | $19,174 | $6,612 |
| CEMEA region's portion of Net Periodic Pension Cost | $ 6,032 | not available | not available |

Assumptions used to develop the net periodic pension cost were as follows:

| For the Years Ended September 30, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Discount Rate – Qualified | 5.5% | 5.5% | 6.0% |
| Discount Rate – Nonqualified | 5.5% | 5.0% | 5.0% |
| Expected Long-Term Rate of Return on Plan Assets | 7.0% | 7.0% | 7.5% |
| Rate of Increase in Compensation Levels – Qualified | 4.0% | 4.0% | 4.0% |
| Rate of Increase in Compensation Levels – Nonqualified | 5.0% | 5.0% | 5.0% |

The expected rate of return on plan assets is primarily based on the long-term historical risks and returns associated with each asset class within the portfolio. The expected return is weighted based on targeted allocation and results in a return rate of 7.0%.

The pension plan's weighted-average asset allocations at September 30, 2004 and 2003 by asset category were as follows:

| Asset Class | Target Allocation | Permissible Range Minimum | Permissible Range Maximum | Actual Allocation 2004 | Actual Allocation 2003 |
|---|---|---|---|---|---|
| Equity Securities | 45% | 40% | 50% | 60% | 66% |
| Fixed Income | 45% | 40% | 50% | 37% | 22% |
| Other | 10% | 5% | 15% | 3% | 12% |
| Total | 100% | | | 100% | 100% |

Visa International and Subsidiaries
## Notes to Consolidated Financial Statements
*(Dollars in thousands, except as noted)*

Plan assets are managed with a long-term perspective to ensure that there is an adequate level of assets to support benefit payments to participants over the life of the pension plan. The goal of the trustee is to manage the asset classes so that they are within 5% of the target allocation. The target asset allocation is a long-term objective that the Company will achieve over the next several years. The investment sub-committee of the Trustees reviews the asset allocation on a quarterly basis and decides whether a faster or slower move from equities or bonds and other investments is appropriate.

The Company's funding policy is to contribute, annually, an amount between the minimum required and the maximum deductible for U.S. federal income tax purposes. Benefit payments and contributions under the pension plans included $27.7 million and $29.0 million paid from employer assets in 2004 and 2003, respectively.

Information about expected cash flows, which reflects expected future service, as appropriate, for the pension and postretirement benefit plans is as follows:

|  | Pension Benefits* |
|---|---|
| Expected Employer Contributions 2005 | $13,924 |
| Expected Benefit Payments |  |
| 2005 | $ 2,237 |
| 2006 | $ 1,734 |
| 2007 | $ 1,998 |
| 2008 | $ 2,272 |
| 2009 | $ 2,317 |
| 2010 - 2014 | $21,959 |

*\* Converted to U.S. Dollars at the September 30, 2004 exchange rate*

As a result of the EU region's incorporation in July 2004, the Visa UK pension plan was amended to segregate VESI employees from Visa International's CEMEA region employees. A Deed of Amendment was filed on October 1, 2004. The deed establishes two sections and how the membership within each section will be determined as well as how the assets and liabilities will be allocated between VESI and the Company. Each section will have a separate formal actuarial valuation effective October 1, 2004 to assess the value of the related liabilities and assets. The Deed allows the Trustees to consider whether the current investment strategy for each section is appropriate to make changes. This means that different strategies could be in place for the two sections in fiscal year 2005. A draft of the valuation results for CEMEA's section is not expected until early 2005.

*Other Plans*

The Company sponsors jointly with Visa U.S.A. the Visa Thrift Plan, a defined contribution plan which covers substantially all of its employees in the United States. Contributions to this plan are funded on a current basis, and the expenses are recognized in the period in which the related payroll expenses are incurred. Personnel expenses attributable to the Company's employees under this plan were $6.7 million, $15.6 million and $30.7 million for the years ended September 30, 2004, 2003 and 2002, respectively. Of the total, the portion related to discontinued operations of Inovant was $5.6 million and $21.3 million for the years ended September 30, 2003 and 2002, respectively.

Effective January 1, 2004, the Company made several amendments to its defined contribution plan. The Company reduced employer matching while increasing the maximum covered pay percentage of employee contributions. The Company eliminated the minimum service requirement for participation in the plan and accelerated the vesting period from five years to three years. Finally, the Company eliminated the credited service requirement for re-hires.

The Company has a nonqualified excess thrift plan and other retirement plans for certain employees. Related costs recorded in personnel expenses were $0.5 million, $1.2 million and $0.9 million for the years ended September 30, 2004, 2003 and 2002, respectively. Of the total, the portion related to discontinued operations of Inovant was $0.1 million and $0.2 million for the years ended September 30, 2003 and 2002, respectively.

## Note 14 – Income Taxes

The Company's income before taxes for the years ended September 30, 2004, 2003 and 2002 consisted of the following components:

| For the Years Ended September 30, | 2004 | 2003 | 2002 |
|---|---|---|---|
| U.S. | $42,388 | $28,258 | $26,383 |
| Non-U.S. | 25,319 | 12,308 | 10,395 |
| Subtotal from Continuing Operations | 67,707 | 40,566 | 36,778 |
| Discontinued Operations | – | 2,591 | 6,590 |
| Total Income Before Taxes | $67,707 | $43,157 | $43,368 |

The Company's income tax expense for the years ended September 30, 2004, 2003 and 2002 consisted of the following:

| For the Years Ended September 30, | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Current** | | | |
| U.S. Federal | $ 8,038 | $ 29,257 | $19,306 |
| U.S. State and Local | 61 | 728 | 1,331 |
| Non-U.S. | 1,383 | 5,192 | 3,562 |
| Total Current Tax Expense | 9,482 | 35,177 | 24,199 |
| **Deferred** | | | |
| U.S. Federal | 19,326 | (10,682) | (3,315) |
| U.S. State and Local | 6,610 | (318) | (3,526) |
| Total Deferred Tax Expense (Benefit) | 25,936 | (11,000) | (6,841) |
| Income Tax Expense | $35,418 | $ 24,177 | $17,358 |

Income tax expense for the years ended September 30, 2004, 2003 and 2002 is included in the Consolidated Statements of Operations as follows:

| For the Years Ended September 30, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Continuing Operations | $35,418 | $23,141 | $14,722 |
| Discontinued Operations | – | 1,036 | 2,636 |
| Income Tax Expense | $35,418 | $24,177 | $17,358 |

The tax effect of temporary differences that give rise to significant portions of deferred tax assets and liabilities at September 30, 2004 and 2003 are presented below:

| September 30, | 2004 | 2003 |
|---|---|---|
| **Deferred Tax Assets** | | |
| Settlement Risk and Other Reserves | $ 17,551 | $ 23,988 |
| Deferred Compensation | 37,527 | 42,202 |
| Accrued Expenses | 2,800 | 23,923 |
| California Research Credit | 5,984 | 8,686 |
| Retirement Plans | 10,930 | 9,308 |
| Other | 9,627 | 18,936 |
| Gross Deferred Tax Assets | 84,419 | 127,043 |
| Valuation Allowance | (5,984) | (8,686) |
| Total Deferred Tax Assets | 78,435 | 118,357 |
| **Deferred Tax Liabilities** | | |
| Premises, Equipment and Software | (20,107) | (8,193) |
| Prepaid Expenses | (1,433) | (4,348) |
| State Taxes | (2,164) | (4,477) |
| Unrealized Gains on Investments | (880) | (734) |
| Total Deferred Tax Liabilities | (24,584) | (17,752) |
| Net Deferred Tax Asset | $ 53,851 | $100,605 |

The major component of the decrease in the net deferred tax asset of $46.8 million was the transfer of $20.7 million of net deferred tax assets to VESI as a result of the incorporation of the EU region on July 1, 2004. The remainder of the change in the net deferred tax asset was due to the reversal of various temporary differences.

The valuation allowance of $6.0 million at September 30, 2004 is entirely attributable to the California research credit, which will carryforward indefinitely. The decrease in the valuation allowance of $2.7 million reflects the current year utilization of the California research credit. The Company's gross deferred tax asset is reduced to a level which management believes is more likely than not to be realized in the future.

Visa International and Subsidiaries
## Notes to Consolidated Financial Statements
*(Dollars in thousands, except as noted)*

The differences between the Company's effective tax rate and the United States federal statutory rate, expressed as a percentage of income before taxes, for the fiscal years ended September 30, 2004, 2003 and 2002 were as follows:

| For the Years Ended September 30, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Statutory Rate | 35.0% | 35.0% | 35.0% |
| State Taxes, net of Federal Benefit & California Research Credit | 6.2% | 0.7% | (3.3%) |
| Travel, Meals and Entertainment | 2.3% | 3.2% | 2.8% |
| Non-U.S. Tax Effect, net of Federal Benefit | 6.6% | 7.9% | 7.1% |
| Federal Research Credit | – | 8.6% | (1.6%) |
| Other | 2.2% | 0.6% | – |
| Effective Tax Rate | 52.3% | 56.0% | 40.0% |

The differences in the effective tax rate among the three years presented result primarily from the reduced benefit of the research credit and increases in deferred state income tax expense due to changes in the overall state tax rate attributable to the geographical distribution of income before taxes.

Income taxes payable of $23.8 million and $50.9 million are included in trade and accrued taxes payable on the Company's Consolidated Balance Sheets for the years ended September 30, 2004 and 2003, respectively.

Cumulative undistributed earnings of the Company's international subsidiaries amounted to $9.4 million as of September 30, 2004, all of which are intended to be permanently reinvested. The amount of income taxes that would have resulted had such earnings been repatriated is estimated to be $3.3 million.

### Note 15 – Derivative Financial Instruments

The Company transacts business in various foreign currencies and uses derivatives to stabilize currency fluctuations compared to budget rates. There were immaterial amounts in earnings representing hedge ineffectiveness, and there were no amounts reclassified into earnings as a result of the discontinuance of cash flow hedges. No amounts were excluded from the assessment of hedge effectiveness for the fiscal years ended September 30, 2004, 2003 and 2002. The balance in accumulated comprehensive income (loss) at September 30, 2004 is not significant and will be reclassified into earnings during fiscal 2005 and 2006 as underlying hedge transactions affect earnings.

The following table provides information about the Company's foreign currency forward and option contracts at September 30, 2004 and 2003:

| September 30, | 2004 | | 2003 | |
|---|---|---|---|---|
| | Notional | Estimated Fair Value | Notional | Estimated Fair Value |
| **Forward Contracts:** | | | | |
| Commitments to purchase | $75,266 | $873 | $79,133 | $1,460 |
| Commitments to sell | – | – | $25,655 | $ (592) |
| **Option Contracts:** | | | | |
| Commitments to sell | $23,201 | $310 | $47,126 | $ 40 |

The currencies underlying the foreign exchange forward contracts consist primarily of Japanese Yen, Pound Sterling, Singapore Dollar, Mexican Peso and Australian Dollar, as well as other foreign currencies. Fair value represents the difference in the value of the contracts at the contractual rate and the current forward price, and generally reflects the estimated amounts that the Company would receive or pay to terminate the contracts at the reporting date based on broker quotes for the same or similar instruments. All foreign exchange forward and option contracts outstanding at September 30, 2004 and 2003 have maturities of less than 16 months.

The Company's derivative financial instruments are subject to both credit and market risk. Credit risk is the risk of loss due to failure of a counterparty to perform its obligations in accordance with contractual terms. Market risk is the potential change in an investment's value caused by fluctuations in interest and currency exchange rates, credit spreads or other variables. The Company continually monitors the credit

worthiness of the financial institutions that are counter parties to its derivative financial instruments and does not consider the risks of counter party nonperformance to be material. Notwithstanding the Company's efforts to manage foreign exchange risk, there can be no assurance that its hedging activities will adequately protect against the risks associated with foreign currency fluctuations. Credit and market risks related to derivative instruments were not considered material at September 30, 2004 and 2003.

### Note 16 – Fair Value of Financial Instruments

The following methods and assumptions were used to estimate the fair value of each class of financial instruments as reported on the Consolidated Balance Sheets:

*Cash and cash equivalents, settlement due from/to members, accounts receivable, other current assets, member collateral, trade payables, and all accrued and other liabilities* – The carrying amounts approximate fair value due to the short period of time to maturity.

*Investments classified as available-for-sale and trading assets* – The fair value is based on quoted market prices.

*Foreign currency forward contracts* – The fair value is based on the estimated amount at which they could be settled based on market exchange rates.

*Foreign currency option contracts* – The fair value is based on dealer quotes and represents the estimated amount the Company would receive or pay to terminate the contracts.

*Debt* – The fair value is estimated based on current interest rates available to the Company for debt instruments with similar terms, degrees of risk and remaining maturities. The carrying value and related estimated fair value of the Company's debt at September 30, 2004 are $39.9 million and $45.2 million, respectively. The carrying value and related estimated fair value of the Company's debt at September 30, 2003 are $44.9 million and $50.9 million, respectively.

### Note 17 – Concentration of Credit Risk

The Company extends credit to its affiliated and non-affiliated members. Collection of trade receivables may be affected by changes in economic or other industry conditions and may, accordingly, impact the Company's overall credit risk. The Company performs ongoing credit evaluations of its customers and reserves for potential credit losses are maintained. At September 30, 2004, the Company had receivables from Visa Europe that represented approximately 24.7% of total gross accounts receivables. At September 30, 2003, the Company had receivables from Visa U.S.A. that represented approximately 26.1% of total gross accounts receivables. No other customer accounted for more than 10% of the Company's total accounts receivables balance at September 30, 2004 and 2003.

The Company also has significant concentration risk related to its guarantees on potential uncollateralized member settlement losses. See Note 12 for additional discussion.

The short-term investments in debt securities are placed with high credit-quality financial institutions or in short duration high quality securities. The Company strives to limit the amount of credit exposure in any one financial institution or type of investment instrument.

### Note 18 – Minority Interest

Minority interest represents a 10.0% preferred stock interest in Visa Human Resources, Inc. ("VHRS"), a subsidiary of Visa International, held by parties external to the Company. VHRS administers certain employee benefit plans and arrangements of the Company. At September 30, 2004 and 2003, the Company owned 90.0% of issued and outstanding preferred shares and maintained 90.0% of the voting rights. The value of the preferred shares held by external parties is $7.0 million, representing 7 shares at $1.0 million per share. The preferred stock pays cumulative dividends at a rate per annum equal to 7.5%, payable quarterly. The preferred stock is mandatorily redeemable by the Company in whole for cash at the redemption price of $1.0 million per share plus accumulated and unpaid dividends on June 30, 2020. The preferred stock is not redeemable without consent prior to this date.

Visa International and Subsidiaries
## Notes to Consolidated Financial Statements
*(Dollars in thousands, except as noted)*

### Note 19 – Commitments

The Company's future minimum payments on non-cancelable leases and other agreements, excluding payments to Visa Resources, at September 30, 2004 are as follows:

| For the Years Ending September 30, | Leases | Marketing | Total |
|---|---|---|---|
| 2005 | $13,923 | $ 63,705 | $ 77,628 |
| 2006 | 10,601 | 28,988 | 39,589 |
| 2007 | 8,297 | 25,437 | 33,734 |
| 2008 | 5,366 | 16,910 | 22,276 |
| 2009 | 2,965 | 20,465 | 23,430 |
| Thereafter | 32,975 | 45,776 | 78,751 |
| Total | $74,127 | $201,281 | $275,408 |

The Company leases certain premises and equipment throughout the world under non-cancelable operating and capital leases with varying expiration dates. The Company's rent expense on operating leases, excluding rents paid to Visa Resources (refer to Note 10), was $32.3 million, $40.3 million and $61.8 million, for the fiscal years ended 2004, 2003 and 2002, respectively. Of these amounts, rent expense of $8.7 million and $33.8 million related to Inovant and included in the results of discontinued operations for the fiscal years ended September 30, 2003 and 2002, respectively. The Company has one capital lease for equipment. The net present value of minimum lease payments on the capital lease approximates book value. Imputed interest expense and accrued interest for the capital lease are not considered material.

The Company leases premises in which, at the expiration of the lease, the Company will incur certain restoration costs such as the cost to remove leasehold improvements. The carrying amounts of these asset retirement obligations were $1.6 million and $5.4 million as of September 30, 2004 and 2003, respectively.

The Company has non-cancelable agreements with certain members, merchants and other organizations for advertising and marketing arrangements that range from one to ten years and extend through 2012. These arrangements cover various programs and support services designed to build sales volume, card acceptance and Visa branded transactions. Over the life of some of these agreements, the Company is required to make payments in exchange for certain advertising and promotional rights.

### Note 20 – Legal Matters

*Department of Justice Antitrust Litigation*

In 1998, an action was brought in United States District Court for the Southern District of New York by the Antitrust Division of the Department of Justice against Visa International, Visa U.S.A. and MasterCard International challenging "dual governance" and Visa U.S.A.'s and MasterCard International's respective rules and policies prohibiting their members from issuing Discover or American Express cards. The government sought only injunctive relief. The government's antitrust case was tried in the summer of 2000. The court issued a preliminary ruling in October 2001 rejecting the dual governance claims but finding that Visa U.S.A.'s By-Law 2.10(e) and MasterCard's counterpart policy on competitive card issuance violated antitrust laws. On November 26, 2001, the court issued a final judgment in which it enjoined Visa U.S.A. and Visa International (collectively "Visa") from enforcing any By-Law or policy that prohibits Visa issuers from issuing general purpose or debit cards in the United States on any other general-purpose card network. The Company appealed the trial court's decision. The Department of Justice chose not to appeal the duality aspect of the trial court's decision. On September 17, 2003, the U.S. Court of Appeals for the Second Circuit upheld the District Court's decision, including the holding that the Company is liable for providing "affirmative encouragement" for Visa U.S.A.'s By-Law 2.10(e). The Company sought further legal review by the entire U.S. Circuit Court of Appeals for the Second Circuit. On January 13, 2004, the Court of Appeals denied the Company's petition for a rehearing. The Company filed a petition for certiorari with the U.S. Supreme Court. On October 4, 2004, the Supreme Court denied the Company's petition.

*Discover Card / American Express Litigation*

On October 4, 2004, Discover Financial Services, Inc. filed a complaint against Visa U.S.A., Visa International, MasterCard Incorporated and MasterCard International Incorporated in the U.S. District Court for the Southern District of New York. The complaint is primarily based on Visa U.S.A.'s By-Law 2.10(e) and MasterCard's counterpart rule, although it also contains references to "Honor All Cards" and "No Surcharge" rules. In general, Discover contends that By-Law 2.10(e) has limited its share of the general purpose credit card market

and prevented Discover from participating in the general purpose debit card market.

On November 15, 2004, American Express filed its own antitrust suit against Visa U.S.A., Visa International, MasterCard Incorporated, MasterCard International Incorporated and other defendants (including eight major U.S. banks) based on damages purportedly suffered by American Express as a result of Visa U.S.A.'s By-Law 2.10(e) and MasterCard's counterpart rule.

*Currency Conversion Litigation*

In February 2000, an action was filed in the Superior Court of the State of California against Visa International, Visa U.S.A. and MasterCard International under California Business and Professions Code §17200. The complaint sought injunctive relief and restitution in connection with Visa's and MasterCard's practice of charging United States issuers a one percent "currency conversion fee" on certain credit transactions made in a foreign currency. In general, the case was tried on theories alleging that the fee was "unconscionable" and that the Company had a disclosure duty to the cardholders of Visa U.S.A.'s members.

On April 7, 2003, the state court issued a Statement of Decision. While the court rejected claims that the currency conversion fee was unconscionable, it ordered Visa U.S.A. and the Company to require Visa U.S.A.'s members to provide "adequate disclosure of currency conversion fees," and ordered restitution of the one percent currency conversion fee to credit card consumers who were charged by and paid the fee to Visa U.S.A.'s members from February 1996 to the present. On September 18, 2003, the court entered its order regarding the means of restitution, which generally adopted a notice and claims procedure.

On November 13, 2003, the Company filed an appeal with the California Court of Appeal. The Company's opening brief was filed on July 28, 2004. Two new currency conversion cases (the Shrieve case and the Castro case) were more recently filed against Visa International, Visa U.S.A., MasterCard Incorporated and MasterCard International Incorporated and consolidated in the California Superior Court in Alameda County. This litigation is based on the Visa and MasterCard practice of charging United States issuers a one percent "currency conversion fee" for certain debit card transactions denominated in a foreign currency. As originally filed, the complaint asserted claims under: 1) California's Unfair Competition Law ("UCL"), Business & Professions Code §17200, and 2) the California Consumers Legal Remedies Act ("CLRA"). On December 10, 2004, the trial court granted the defendants' demurrer regarding the CLRA claim, and granted plaintiffs until January 5, 2005 to file an amended complaint. In other respects, this case is in its preliminary stages

A number of purported class actions alleging violations of the Sherman Act and Truth-In-Lending Act have been consolidated in the United States District Court for the Southern District of New York. The consolidated complaint alleges that Visa International, Visa U.S.A., MasterCard International and a number of large U.S. card-issuing banks (affiliates of Citibank, Chase, Bank One, Bank of America, MBNA, Household and Providian) conspired to impose a mark-up of at least 1% on foreign currency transactions by holders of U.S.-issued Visa Cards. The complaint also alleges that defendants failed to disclose such charges to cardholders. The complaint seeks treble damages for foreign currency conversion and optional issuer fee revenue, injunctive relief and attorneys' fees. On July 3, 2003, the court granted in part and denied in part defendants' motion to dismiss the consolidated complaint. The court dismissed the Truth-In-Lending Act claims asserted against the Company. The court denied the motion to dismiss the antitrust claims against the Company (and against all other defendants) on the grounds that the facts pleaded, if assumed true, sufficiently stated a cognizable antitrust claim. The court noted that a number of the Company's arguments for dismissal may be reasserted at the summary judgment motion stage.

**Visa International and Subsidiaries**
## Notes to Consolidated Financial Statements
*(Dollars in thousands, except as noted)*

On October 15, 2004, the court certified a class of all holders of Visa and MasterCard-branded credit cards issued by any of the seven defendant banks who were assessed a foreign currency conversion transaction fee. Defendants moved for reconsideration of the class certification order; in particular, defendants have asked the Court to exclude from the class all cardholders having arbitration clauses in their cardholder agreements with issuing bank defendants. The motion for reconsideration is fully briefed and awaiting decision.

The court ordered that fact discovery be completed by November 19, 2004, although some additional fact discovery will occur after that date. Expert discovery is to conclude by April 2005. The trial in this matter is scheduled to begin on October 6, 2005.

*Merchant and Consumer Litigation*

In 1996, a class action was filed in the United States District Court for the Eastern District of New York against Visa U.S.A., the largest member of the Company, by Wal-Mart and The Limited on behalf of themselves and other merchants alleging, in general, that Visa's "Honor All Cards" rule violates sections one and two of the Sherman Antitrust Act. The Company was not a defendant in this action. In February 2000, the presiding judge certified the class. Visa U.S.A. appealed that decision, but the U. S. Court of Appeals for the Second Circuit affirmed the decision in October 2001. Visa U.S.A.'s petition for rehearing by the U.S. Court of Appeals for the Second Circuit was declined on December 5, 2001. In April 2002, Visa U.S.A. sought Supreme Court review of the class certification issue; but on June 10, 2002 the Supreme Court declined to hear the appeal. That decision did not address the merits of the case, only whether it could proceed as a class action. Class action notice was mailed and published during September 2002 with a 60-day opt out period ending on November 14, 2002. Motions for summary judgment as to liability and damages were argued on January 10, 2003. The court issued its summary judgment decision on April 1, 2003, denying most of those motions. The trial was scheduled to commence on April 28, 2003. On April 30, 2003, following MasterCard's pre-trial settlement on April 28, 2003, Visa U.S.A. and the plaintiffs agreed on a Memorandum of Understanding for settlement terms. On December 19, 2003 the court approved the basic provisions of the settlement. The general terms of the settlement are as follows: Visa U.S.A. agreed to pay $2.0 billion to the plaintiffs in ten equal payments over the next ten years; Visa U.S.A. temporarily reduced U.S. debit interchange fees; and Visa U.S.A. modified its "Honor All Cards" rule in such a way as to allow merchants in the U.S. to choose whether to accept U.S.-issued Visa debit cards. Visa International was not a party to this case.

In addition to the class action lead by Wal-Mart, seven actions were filed against Visa U.S.A. by merchants who had "opted out" of the class. All of the cases were consolidated in the U.S. District Court for the Eastern District of New York and one of the "opt out" plaintiffs has settled. The remaining six merchants have amended their complaints and added a Sherman Act Section One challenge to Visa's interchange mechanism. The "opt out" merchant litigation is not covered by the terms of the Wal-Mart Settlement Agreement. Business negotiations between Visa U.S.A. and the remaining six merchants are ongoing. Visa International is not a party to these cases. Accordingly, no provision for any liability has been recognized in the Company's financial statements.

*Credit/Debit Card "Tying" Cases*

Thirty-seven putative class action complaints have been filed by numerous plaintiffs in nineteen states asserting claims against Visa U.S.A., Visa International and MasterCard International alleging violations of state unfair competition laws resulting from the networks' "Honor All Cards" rule. The Company is named as a defendant in only six cases, all filed in California, asserting claims against the Company under the Cartwright Act and Section 17200 of the California Business and Professions Code. On October 6, 2004, the judge in the California cases granted the Company's demurrer to the cause of action based on the Cartwright Act.

Plaintiffs in these cases claim that the defendants unlawfully tied retail business acceptance of Visa- and MasterCard-branded debit cards to the acceptance of Visa- and MasterCard-branded credit cards. Plaintiffs further claim that because of their market power, issuers charged retailers "supra-competitive" prices for debit card services and retailers, in turn, passed these costs on to the general public through higher overall prices for goods and services. All of these cases are still in the early stages of litigation.

*Morgan Stanley Dean Witter/Discover*

In May 2000, Morgan Stanley Dean Witter & Co. and Morgan Stanley Dean Witter Bank Limited (collectively "MSDW"), the issuer of the Discover card, filed a complaint before the EU Commission challenging as anticompetitive Visa International By-Law 2.12(b), which provides that organizations "deemed to be a competitor" of Visa may not become members. Visa's Reply, which explained inter alia that the Rule is pro-competitive and enhances intersystem competition, was filed in July 2000. Visa subsequently replied to further requests for information from the European Commission in relation to the investigation in 2003 and 2004. In August 2004 the Commission issued a Statement of Objections to Visa International, alleging that the implementation of the rule as it relates to MSDW has not been objectively applied and has caused a restriction of competition in the acquiring market in the UK. In September 2000, MSDW filed parallel proceedings in the U.K. courts, claiming infringement of EU and U.K. anti-trust provisions and unspecified damages. In May 2001, Visa succeeded in obtaining a stay of the UK proceedings pending the outcome of the Commission's investigation.

The Company is presently involved in the matters described above and other legal actions. The Company reviews the effect, if any, that litigation matters may have upon the Company or its financial position. With regard to certain cases pertaining to U.S. operations, the Company is indemnified against damages by Visa U.S.A., Inc. The Company will continue to review the strength of its defenses and indemnifications, and will make accruals when and if necessary.

**Note 21 – Subsequent Event**

On December 13, 2004, a class action complaint was filed in the Superior Court for the State of California against Visa International and Visa U.S.A. under California Business and Professions Code §17200. The complaint alleges that the defendants did not adequately disclose the rate used to perform currency conversion and seeks restitution and injunctive relief. The defendants' response to the complaint is due on February 2, 2005. The Company will continue to review the strength of its defenses and will make accruals when and if necessary.

**Note 22 – Selected Quarterly Financial Data (Unaudited)**

The following is a summary of selected quarterly financial data for the years ended September 30, 2004 and 2003:

|  | Fiscal 2004 Quarters Ended | | | | |
|---|---|---|---|---|---|
|  | December 31 | March 31 | June 30 | September 30* | Total |
| Revenue | $386,566 | $400,392 | $383,616 | $263,525 | $1,434,099 |
| Operating Income (Loss) | $ 83,090 | $ 63,031 | $ (7,744) | $ (65,094) | $ 73,283 |
| Net Income (Loss) | $ 39,868 | $ 30,600 | $ (6,276) | $ (31,903) | $ 32,289 |

* Excludes EU region results due to incorporation, refer to Note 4

|  | Fiscal 2003 Quarters Ended | | | | |
|---|---|---|---|---|---|
|  | December 31 | March 31 | June 30 | September 30 | Total |
| Revenue | $338,845 | $341,426 | $345,716 | $350,399 | $1,376,386 |
| Operating Income (Loss) | $ 68,327 | $ 33,096 | $ 21,186 | $ (73,011) | $ 49,598 |
| Income (Loss) from Continuing Operations | $ 42,193 | $ 20,557 | $ 13,377 | $ (58,702) | $ 17,425 |
| Income from Discontinued Operations | $  1,555 | – | – | – | $  1,555 |
| Net Income (Loss) | $ 43,748 | $ 20,557 | $ 13,377 | $ (58,702) | $ 18,980 |

## Certification of Chief Executive Officer

I, Christopher J. Rodrigues, certify that:

1. I have reviewed this report consisting of Visa International Consolidated Financial Statements as of, and for, the period ended September 30, 2004;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and

3. Based on my knowledge, the financial statements and other financial information in this report fairly present in all material respects the financial condition, results of operations and cash flows of Visa International as of, and for, the period presented in the report.

*[signature]*

Christopher J. Rodrigues
President and Chief Executive Officer
January 14, 2005

**Certification of Chief Financial Officer**

I, Kenneth F. Sommer, certify that:

1. I have reviewed this report consisting of Visa International Consolidated Financial Statements as of, and for, the period September 30, 2004;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and

3. Based on my knowledge, the financial statements and other financial information in this report fairly present in all material respects the financial condition, results of operations and cash flows of Visa International as of, and for, the period presented in the report.

*[signature: Kenneth Sommer]*

Kenneth F. Sommer
Executive Vice President and Chief Financial Officer
January 14, 2005



**Corporate Headquarters**
P.O. Box 8999
San Francisco, California
94128-8999
United States of America

**Asia Pacific**
Marunouchi Building
24th Floor
4-1 Marunouchi
2-chome
Chiyoda-ku, Tokyo 100-6324
Japan

**Canada**
P.O. Box 124
Toronto, Ontario M5H 3Y2
Canada

**Central & Eastern Europe,**
**Middle East & Africa**
P.O. Box 39662
London W2 6WH
United Kingdom

**Europe**
P.O. Box 39662
London W2 6WH
United Kingdom

**Latin America & Caribbean**
P.O. Box 026098
Miami, Florida 33102-6098
United States of America

**United States**
P.O. Box 8999
San Francisco, California
94128-8999
United States of America

Visit us at www.visa.com

© 2004 Visa International Service Association
Printed in the U.S.A.